## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK
## MANHATTAN DIVISION

| | | |
|---|---|---|
| **WILLTON NC NY, LLC** | ) | CASE NO. |
| 350 Fifth Avenue, Suite 7110 | ) | |
| New York, NY 10118 | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE: |
| | ) | |
| vs. | ) | |
| | ) | **COMPLAINT** |
| **MH I INVESTMENT LLC** | ) | |
| Registered Agent: Frank T. Sinito | ) | |
| 4000 Key Tower, 127 Public Square | ) | |
| Cleveland, OH 44114 | ) | **JURY TRIAL WAIVED BY** |
| | ) | **CONTRACT, TO BE TRIED BY THE** |
| and | ) | **COURT** |
| | ) | |
| **FRANK T. SINITO** | ) | |
| 6736 Eagle Mills Rd | ) | |
| Willoughby, OH 44094 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **MALISSE SINITO** | ) | |
| 6736 Eagle Mills Rd | ) | |
| Willoughby, OH 44094 | ) | |
| | ) | |
| Defendants. | ) | |

For its Complaint against MH I Investment LLC ("MH I"), Frank T. Sinito ("Sinito"), and

Malisse Sinito (Sinito and Malisse Sinito, collectively the "Sinitos," and the Sinitos and MH I,

collectively "Defendants"), Plaintiff Willton NC NY, LLC ("Willton") hereby states as follows:

## OVERVIEW OF THE DISPUTE

1.      This lawsuit arises from Defendants' numerous and persistent breaches of contract

and accompanying guaranty, all of which appear to have been part of a pervasive scam by which

Defendants intended to, and did, defraud Willton.

2.      Defendants' conduct was part of a pattern and practice of racketeering activity

aimed at defrauding and embezzling from Willton and other victims.

3.      The Sinitos represented to Willton that MH I was formed to own and/or manage low-income housing properties throughout the country.

4.      The Sinitos represented to Willton that MH I is an entity controlled by the Sinitos.

5.      MH I is one of numerous entities controlled by the Sinitos operating collectively under the moniker "The Millennia Companies," which constitute an enterprise, referred to in this Complaint as the "Sinito Enterprise."

6.      The Sinito Enterprise operates in and effects interstate commerce, and upon information and belief, includes at least the following entities and individuals: MH I, Millennia Housing Development, Ltd., Millennia Housing Management Ltd., Millennia Housing Capital LLC, Hartford Avenue Apartments LLC, Peace Lake LA TC LP, Snowberry Investments LLC, Marquette Snowberry Limited, Cassidy Village, Ohio LLC, Memphis Towers TN TC LP, Brookwood NC LLC, Wilshire Woods Apartments LLC, Morningside 2192 TN LLC, Winchester I Investment LLC, Frank Sinito, and Malisse Sinito. On information and belief, additional entities and individuals comprising the Sinito Enterprise will be uncovered in discovery.

7.      On information and belief, The Millennia Companies, including MH I, were formed and conduct business as part of the Sinito Enterprise, which is involved in racketeering activity.

8.      Based on their claimed vast and successful experience in the industry, the Sinitos pitched to Willton an investment opportunity in MH I related to nine low income housing apartment complexes in Ohio, Michigan, and West Virginia (the "Properties"), starting in October 2022. That investment opportunity was part of Defendants' business plan to receive federal Low Income Housing Tax Credits for various properties MH I owned and/or operated.

9.      In January 2023, based on Defendants' representations, Willton invested over $19 million in FM15 Investments, LLC ("FM15"), an entity Defendants had formed and controlled to

own and/or operate the Properties through nine property owner entities (the "Property Owners") controlled by Frank T. Sinito. Pursuant to the Amended and Restated Operating Agreement of FM15 Investments, LLC ("Amended Operating Agreement"), this investment resulted in Willton becoming the majority owner and so-called "Investor Member" of FM15, and MH I becoming a minority owner and the "Operating Member" of FM15. A true and correct copy of the Amended Operating Agreement is attached as **Exhibit 1** and incorporated by reference in this Complaint.

10.     In return for Willton's investment, MH I promised to pay a contractual minimum of at least an eight percent (8%) yearly return on Willton's investment (the "Contractual ROI Payment"), as well as a minimum of at least a fifteen percent (15%) Internal Rate of Return ("IRR") (as that term is defined in the Amended Operating Agreement) return on Willton's investment at the end of investment period. MH I also provided Willton a contractual Put Right that gave Willton the option to sell its interest in two specific properties to MH I for $6,327,528.14.

11.     The Sinitos also executed a joint and several personal guaranty (the "Guaranty") in favor of Willton in which they personally guaranteed certain of MH I's financial obligations to Willton. The Guaranty is attached as Exhibit I to the Amended Operating Agreement.

12.     Despite these clear contractual obligations protecting Willton's investment, however, Defendants have repeatedly breached their duties to Willton, and have defrauded and embezzled from Willton from the beginning.

13.     By way of example only, Willton learned in March 2024 that Sinito had been investigated by the United States Department of Housing and Urban Development ("HUD"), ultimately resulting in Sinito personally being debarred from participating in any federal housing program or receiving any federal Low Income Housing Tax Credits for a period of five years. Instead of disclosing this information to Willton, however, Defendants made participation in

federal housing programs and obtaining federal Low Income Housing Tax Credits a central part of the business plan upon which they pitched the investment to Willton (and then went so far as to make the business plan an exhibit to the Amended Operating Agreement, along with a schedule of milestones and timing for benchmarks). Defendants then further expressly reiterated in the Amended Operating Agreement that there were no investigations or proceedings that would interfere with those plans, despite knowing at a minimum that they were in serious jeopardy of being prohibited from engaging in federal low income housing projects or obtaining federal Low Income Housing Tax Credits.

14.     By way of further example, Defendants have engaged in a pattern and practice of fraudulently inducing their partners such as Willton to invest in companies operating as part of the Sinito Enterprise, and then embezzling and/or fraudulently transferring the investments to the Sinito Enterprise's benefit.

15.     In April 2024, Willton further discovered that Defendants had almost immediately from the outset of the parties' relationship been misapplying, misappropriating, and embezzling Property Owners' and/or FM15's funds, in violation of Defendants' contractual obligations to Willton. Defendants have made over 100 unauthorized disbursements of funds from the FM15 operating account, of at least $1,463,130, to Sinito directly, to an entity associated with him, or to an unrelated entity for projects unrelated to FM15.

16.     MH I also has failed and refused to pay Willton the Contractual ROI Payment, the most recent of which was due on April 15, 2024.

17.     After MH I failed to make this payment, Willton made a demand pursuant to the Guaranty, but the Sinitos similarly breached the Guaranty and have refused to contribute the

necessary capital to MH I so that can contribute the funds to FM15 and then make the Contractual ROI Payment to Willton.

18.    On May 6, 2024, Defendants' numerous contractual breaches and fraudulent behavior led Willton to exercise its contractual right under the Amended Operating Agreement to remove MH I as the Operating Member of FM15. As part of that removal, Willton also invoked the Put Right from the Amended Operating Agreement, but MH I has breached its obligation to purchase Willton's interest in these properties pursuant to the Put Right.

19.    Based on the foregoing, Willton brings this lawsuit seeking relief under and pursuant to the Amended Operating Agreement and related Guaranty.

## THE PARTIES

20.    Willton, the only plaintiff in this lawsuit, is a Delaware limited liability company. None of Willton's members (anywhere in its ownership chain) is a citizen of Ohio for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a).

21.    MH I, one of the defendants in this lawsuit, is an Ohio limited liability company. Upon information and belief, all members of MH I (throughout its ownership chain) are citizens of Ohio.

22.    Upon information and belief, the Sinitos (the other defendants in this lawsuit) are domiciled in and are citizens of Ohio.

23.    Thus, upon information and belief, all Defendants are citizens of Ohio for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a).

## JURISDICTION AND VENUE

24.    This Court has original subject matter jurisdiction pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because this action arises, in part, under the Federal Racketeer Influenced and Corrupt Organizations Act.

25.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because no plaintiff is from the same state as any defendant, so there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

26.     To the extent necessary, this Court also can exercise supplemental jurisdiction over any and all state law claims pursuant to 28 U.S.C. § 1367 because all such claims are so related to the claims in the action within this Court's original jurisdiction that they form part of the same case or controversy.

27.     This Court also has personal jurisdiction over Defendants, and venue is proper in this Court. Specifically, in Section 12.02 of the Amended Operating Agreement, the parties all agreed to submit "to the jurisdiction of the federal courts sitting in the State of New York." In that same clause, the parties all also agreed to waive their rights to a jury trial.

## FACTUAL BACKGROUND

### A.    DEFENDANTS' OBLIGATIONS UNDER THE OPERATING AGREEMENT AND THE GUARANTY

28.     Starting in October 2022, Defendants began seeking an investment from Willton, premised on a business plan to operate low income housing projects, which Defendants claimed would permit them to obtain federal Low Income Housing Tax Credits for various properties across the country.

29.     As part their inducement of Willton, Defendants represented that they and their related companies had the necessary governmental approval, authority, and ability to consummate all the transactions related to the Properties and to the business plan they had created to operate low income housing projects and obtain federal Low Income Housing Tax Credits.

30.     Based on and in reliance upon Defendants' representations, the business plan Defendants presented (which Defendants attached as an exhibit to the Amended Operating Agreement, along with a schedule of milestones and timing for benchmarks), and Defendants' claimed experience and success in managing low incoming housing projects across the country, Willton agreed in January 2023 to invest over 19 million dollars with Defendants, for which Willton received an 84.86% interest in FM15.

31.     The Sinitos also transferred their remaining fifteen and 14/100 percent (15.14%) membership interest in FM15 to MH I.

32.     To formalize and govern Willton's investment, on January 30, 2023, Defendants and Willton executed the Amended Operating Agreement.

33.     The Amended Operating Agreement admitted MH I as the "Operating Member" of FM15, and it admitted Willton as the "Investor Member."

34.     The Amended Operating Agreement also provided numerous contractual rights to Willton and corresponding obligations to Defendants, including but not limited to:

    a.  MH I promised Willton the Contractual ROI Payment, which guaranteed Willton a minimum of an eight percent (8%) yearly return on its investment (Amended Operating Agreement at § 8.02);

    b.  MH I promised Willton that upon the end of the investment period, MH I would cause its affiliate to provide directly to Willton a minimum of a fifteen percent (15%) IRR return on its investment (*id*. at §§ 2.05, 11.02);

    c.  Willton received a Put Right that, if exercised, would provide Willton the right to sell and MH I the obligation to buy Willton's interest in two specific properties for $6,327,528.14 (*id.* at § 11.02);

    d.  MH I promised to provide Willton with full and transparent financial information related to its investment, including by providing complete books and records and timely, accurate, and fulsome financial reporting (*id.* at §§ 3.05, 5.01, 5.02, and Exhibit F);

    e.  MH I promised to comply with a process that required Willton's consent for enumerated contractual "Major Decisions," which included the obligation not

to make unauthorized distributions or payments to themselves or other parties (*id.* at § 4.01(b)(14));

f.   "In order to induce" Willton to enter into the Amended Operating Agreement, MH I expressly represented, warranted, and covenanted to Willton, among other things, that "[e]xcept as disclosed to [Willton], there is no existing fact which would likely be expected to have a material adverse effect (financial or otherwise) on any of the Properties or any Property Owner." (*Id.* at § 2.08(c).); and

g.   MH I also represented, warranted, and covenanted to Willton that "[t]here are no proceedings pending, or to [MH I's] actual knowledge…threatened against" it or any of its Affiliates "which seek to restrain or enjoin the consummation of or declare unlawful the transactions contemplated hereunder; there are no judgments, injunctions, orders or other judicial or administrative mandates outstanding against [MH I] or any of its Affiliates which would interfere with its or its Affiliate's ability to perform its obligations hereunder or under the Property Owner Partnership Agreements or would have a material adverse effect upon the Company or any Property Owner; [MH I] has no actual knowledge of any threatened litigation against such party or any of its Affiliates which have or is likely to have a material adverse effect on the Company or such party's ability to consummate the transactions contemplated hereunder or under the Property Owner Partnership Agreements." (*Id.* at § 2.09(d).)

35.    Concurrently with and as an exhibit to the Amending Operating Agreement, the Sinitos also executed the Guaranty in Willton's favor, thereby protecting Willton's investment by personally guaranteeing certain of MH I's financial obligations under the Amended Operating Agreement to Willton. Accordingly, in the Guaranty, the Sinitos personally guaranteed both the Put Right as well as the Contractual ROI Payment.

36.    The Sinitos both signed the Guaranty jointly and severally in Willton's favor.

37.    The Guaranty specifically states that, Willton was "unwilling to enter into the Operating Agreement unless [each of the Sinitos] provides the guaranties under this Agreement."

38.    Section 6 of the Guaranty also states: "Attorneys' Fees. In the event it becomes necessary for [Willton] to exercise its rights under this Agreement, whether suit be brought or not, the [Sinitos] shall be liable for all reasonable costs and reasonably attorneys' fees incurred by

[Willton], including costs and attorneys' fees incurred by [Willton] in any appellate and post-judgment collection proceedings."

## COUNT 1
### Piercing the Corporate Veil

39.    Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-38 of this Complaint.

40.    MH I is an entity controlled by the Sinitos.

41.    The Sinitos exert such dominion and control over MH I that MH I has no separate mind, will, or existence of its own.

42.    The Sinitos' dominion and control over MH I has been, and continues to be, exercised in a manner to commit harmful, unfair, unjust, inequitable, wrongful, and fraudulent acts against Willton, including MH I's breach of the contract, fraud, and fraudulent transfer (as set forth below in Counts 2, 6, and 7, incorporated by reference).

43.    MH I is and, at all relevant times was, undercapitalized and unable to satisfy the financial obligations that it undertook, including those contractual obligations owed to Willton.

44.    MH I's inability to satisfy its contractual obligations, including to Willton, is a direct result of the Sinitos' control and dominion over MH I, including but not limited to one or more of the Sinitos directing MH I to make financial transfers directly to Sinito (MH I's managing member) and to other entities that one or more of the Sinitos' control.

45.    As a direct and proximate result of the Sinitos' control over MH I, Willton has sustained financial harm, as set forth in more detail throughout this Complaint.

46.    MH I owes Willton an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial. Any alleged separate corporate existence

of MH I and the Sinitos should be disregarded in equity and Willton should be permitted to recover all damages and liabilities otherwise attributable to MH I directly from the Sinitos.

**COUNT 2**
**Breach of the Contract (Amended Operating Agreement) against MH I**

47.     Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-46 of this Complaint.

48.     The Amended Operating Agreement constitutes a valid, binding, and enforceable contract.

49.     Starting almost immediately after its execution in January 2023, MH I began breaching the Amended Operating Agreement in numerous ways.

50.     For example, despite Willton's repeated requests, in violation of Sections 3.05, 5.01, and 5.02 of the Amended Operating Agreement, MH I has failed to provide Willton with full and transparent financial information related to its investment, and has continually refused to provide complete books and records and timely, accurate, and fulsome financial reporting. As just a few examples of these breaches:

      a.     MH I has never provided any of the following: (1) a quarterly asset report; (2) a current year cash flow reforecast; (3) cash flow statements containing columns for quarterly and year-to-date pro forma and quarterly and year-to-date; (4) a copy of all written reports produced by Operating Member that discuss historical or projected performance of the Properties; or (5) a competitive market survey for the market in which the Properties are competing, reflecting the rents being charged by competing projects, and if available, the occupancy levels of such competing projects;

      b.     MH I has consistently provided Willton with incorrect, incomplete, and even fraudulent financial records and accompanying oral or written statements; and

      c.     MH I has not provided Willton with tax returns for FM15 or accurate Form K-1(s), and MH I did not consult with Willton or obtain Willton's approval concerning the filing of tax returns as required.

51.     MH I also has misappropriated more than $1.4 million by making hundreds of unauthorized disbursements from Property Owners' and/or FM15's funds without Willton's consent in violation of the "Major Decisions" requirements of Section 4.01(b)(14) of the Amended Operating Agreement. Many of these unauthorized disbursements have been to Sinito himself or other entities in which he has a financial interest unrelated to FM15.

52.     To date, Willton has identified at least eleven entities that received unauthorized transfers in violation of the "Major Decisions" requirements. These transactions, often endorsed personally by Sinito, appear to have occurred regularly and with respect to each FM15 property and Property Owner.

53.     Similarly, to date, Willton has identified at 85 unauthorized payments totaling $1,052,730 made to Sinito personally.

54.     Along with these unauthorized payments, Willton has discovered numerous other similar improper transfers (totaling at least 108 unauthorized transactions identified thus far). Each instance of such unauthorized payments constitutes a separate breach of the "Major Decisions" obligations from Section 4.01(b)(14) of the Amended Operating Agreement.

55.     Despite repeated demands by Willton, MH I has also failed to make distributions in violation of Section 8.02 of the Amended Operating Agreement, under which Willton should have received 100% of all distributions until Willton has received an 8% per annum return.

56.     Similarly, despite repeated demands by Willton, MH I also has failed and refused to pay Willton the Contractual ROI Payment when it became due on April 15, 2024, in violation of Section 8.02 of the Operating Agreement.

57.     After MH I's failure to pay the Contractual ROI Payment, Willton delivered a notice (the "Contractual ROI Payment Notice Letter") to MH I (and the Sinitos) under Section

8.02 of the Amended Operating Agreement. As identified in the Contractual ROI Payment Notice Letter, MH I owed payment to Willton in the amount of at least $1,288,131.05 as return on its investments earned from January 30, 2023 to December 31, 2023. MH I still has not paid the Contractual ROI Payment. A true and accurate copy of the Contractual ROI Payment Notice Letter is attached as **Exhibit 2** and incorporated by reference in this Complaint.

58.     As discussed in more detail below with respect to Defendants' fraudulent behavior, MH I further breached the representations provisions in the Amended Operating Agreement, including its representations that there were no actual or threatened proceedings that would threaten or jeopardize its ability to act as FM15's Operating Member or achieve the goals of the Amended Operating Agreement, all in violation of Section 2.08 and 2.09 of the Amended Operating Agreement.

59.     MH I has also breached the Amended Operating Agreement by failing to make distributions to Members in accordance with the Amended Operating Agreement.

60.     Finally, MH I has failed to abide by its obligation under Section 11.02 of the Amended Operating Agreement pursuant to the Put Right by refusing to purchase Willton's interest in two specific properties for $6,327,528.14 within sixty (60) days of Willton's May 6, 2024 provision of notice to Defendants that it was exercising the Put Right.

61.     Based upon the above and MH I's other numerous breaches of the Amended Operating Agreement, on May 6, 2024, Willton issued a notice (the "Removal Event Notice") to Defendants. That Removal Event Notice, which Willton transmitted pursuant to Section 4.04(a) of the Amended Operating Agreement, explained that Defendants had engaged in numerous "Removal Events," and Willton was removing MH I as the Operating Member of FM15. As a result, pursuant to the terms of the Amended Operating Agreement, MH I is no longer the

Operating Member of FM15, although it remains obligated to continue managing the day-to-day affairs of FM15 until a new manager can be named. A true and accurate copy of the Removal Event Notice is attached as **Exhibit 3** and incorporated by reference in this Complaint.

62.    Willton has performed and/or fulfilled its obligations and conditions precedent under the Amended Operating Agreement in all material respects, including by having provided Defendants with written notices and cure periods for any and all such breaches that may be required by the Amended Operating Agreement.

63.    Willton has suffered damages as a direct and proximate result of MH I's breaches of the Amended Operating Agreement in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

64.    In the alternative, Willton seeks the equitable remedy of rescission of the Amended Operating Agreement and the return of its total investment with Defendants of $19,250,285 plus interest.

**COUNT 3**
**Breach of the Contract (Guaranty) against the Sinitos**

65.    Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-64 of this Complaint.

66.    The Guaranty constitutes a valid, binding, and enforceable contract.

67.    When MH I failed and refused to make the Contractual ROI Payment when it became due on April 15, 2024, Willton sent a follow up letter on May 7, 2024 (the "Guaranty Demand Letter") demanding that the Sinitos make the necessary capital contributions to MH I so that MH I could then contribute the funds to FM15 and make the Contractual ROI Payment to Willton pursuant to the Sinitos' obligations under the Guaranty. A true and accurate copy of the Guaranty Demand Letter is attached as **Exhibit 4** and incorporated by reference in this Complaint.

68.    In breach of their guaranty obligations, the Sinitos have failed and refused to make the necessary capital contributions to MH I so that MH I could then contribute the funds to FM15 and pay Willton the Contractual ROI Payment pursuant to the Guaranty.

69.    In further breach of their guaranty obligations, the Sinitos also have failed and refused to provide the most recent balance sheet to evidence not less than $41,110,000 in equity, and to evidence that the Sinitos have not conveyed, transferred, or collateralized their assets so as to reduce the same on the balance sheet below $41,110,000 without Willton's prior consent.

70.    Willton has performed and/or fulfilled its obligations under the Guaranty in all material respects.

71.    Willton has suffered damages as a direct and proximate result of the Sinitos' breaches of the Guaranty in an amount in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

72.    In the alternative, Willton is entitled to specific performance in the form of an order mandating that the Sinitos distribute the amount of the Contractual ROI Payment to Willton and provide a true and correct most recent balance sheet evidencing not less than $41,110,000 in equity.

73.    Further, Willton is entitled to an award of all its attorneys' fees and costs from the Sinitos pursuant to Section 6 of Guaranty.

### COUNT 4
### Declaratory Judgment (Amended Operating Agreement) against MH I

74.    Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-73 of this Complaint.

75.    Willton brings this Count pursuant to 28 U.S.C. § 2201(a).

76.    An actual controversy has arisen between Willton and MH I as to MH I's breaches of the provisions of the Amended Operating Agreement.

77.    Willton seeks a declaration that:

    a.    MH I must pay Willton the Contractual ROI Payment in an amount of at least $1,288,131.05 as of April 15, 2024 plus interest;

    b.    MH I must pay Willton the amount of the Put Right by purchasing Willton's interest in the relevant properties for $6,327,528.14, as of July 22, 2024 plus interest;

    c.    MH I must make all distributions to Members in accordance with the Amended Operating Agreement; and

    d.    MH I must operate FM15 and each Property Owner pursuant to Willton's direction until such time as a new manager is named.

78.    Such a declaration will conclusively establish the rights and legal relations of the parties.

79.    Willton seeks an expedited hearing on its request for Declaratory Judgment as soon as possible pursuant to Rule 57 of the Federal Rules of Civil Procedure, and will be filing a separate motion seeking that relief.

## COUNT 5
### Declaratory Judgment (Guaranty) against the Sinitos

80.    Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-79 of this Complaint.

81.    Willton brings this Count pursuant to 28 U.S.C. § 2201(a).

82.    A controversy has arisen between Willton and the Sinitos as to the Sinitos' breaches of the provisions of the Guaranty.

83.    Willton seeks a declaration that:

    a.    The Sinitos are jointly and severally obligated to make the necessary capital contributions to MH I so that MH I could then contribute the funds to FM15 and tender immediately to Willton the Contractual ROI Payment in the amount of at least $1,288,131.05 as of April 15, 2024 plus interest, as guarantors of MH I's obligations under the Amended Operating Agreement; and

b.      The Sinitos are obligated to provide to Willton a true and correct copy of their most recent balance sheet evidencing not less than $41,110,000 in equity.

84.     Such a declaration will conclusively establish the rights and legal relations of the parties.

85.     Willton seeks an expedited hearing on its request for Declaratory Judgment as soon as possible pursuant to Rule 57 of the Federal Rules of Civil Procedure, and will be filing a separate motion seeking that relief.

## COUNT 6
## Fraud against all Defendants

86.     Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-85 of this Complaint.

87.     When Defendants were seeking to induce Willton to make its investment, one of the primary elements of the pitch was that Defendants had a business plan involving efforts to obtain federal Low Income Housing Tax Credits for various properties Sinito or MH I owned and/or operated throughout the country.

88.     Thus, when the parties executed the Amended Operating Agreement in January 2023, Defendants expressly represented to Willton that there were no actual or threatened proceedings that would threaten or jeopardize MH I or the Sinitos' ability to act as Operating Member of FM15 or achieve the goals of the Amended Operating Agreement. Defendants made the business plan an exhibit to the Amended Operating Agreement, along with a schedule of milestones and timing for benchmarks.

89.     Unbeknownst to Willton until March 2023, however, Sinito had been investigated by HUD, ultimately resulting in Sinito personally being debarred from participating in any federal housing program for a period of five years.

16

90.    Upon information and belief, HUD accused Sinito and Millennia Housing Management Ltd. of financial mismanagement of tenants' security deposits as well as taxpayer funds providing housing assistance, along with not maintaining property conditions.

91.    This debarment sanction is effectively a death penalty for entities like Millennia Housing Management Ltd. that participate in government contracts, because it prohibits any Millennia Housing Management Ltd.-affiliated entity, and Sinito personally, from entering into new business with any federal government agencies, including HUD, or obtaining Low Income Housing Tax Credits for five years. Indeed, Sinito, through counsel, has now admitted to Willton that he already has sold or intends to sell his low income housing projects.

92.    Willton anticipates that discovery will demonstrate that Defendants had been aware of the investigation, yet never disclosed it to Willton. Instead, they intentionally induced Willton to invest in FM15 premised on a business plan to obtain federal Low Income Housing Tax Credits.

93.    By way of example, prior to the parties' execution of the Amended Operating Agreement, Defendants provided their own internal 2020-2021 HUD Audit Reports to Willton to induce it to invest, claiming that the 2022 HUD Audit Reports were not ready yet. Now, more than eighteen months later, Defendants still have not provided the 2022 HUD Audit Reports to Willton, even though they submitted them to HUD without informing Willton.

94.    Defendants further falsely represented in the Amended Operating Agreement that they were not aware of any actual or threatened proceedings against them that would threaten or jeopardize their ability to act as FM15's Operating Member or achieve the Amended Operating Agreement's goals. Similarly, they also falsely represented in the Amended Operating Agreement that there were no existing facts which would likely be expected to have a material adverse effect (financial or otherwise) on any of the Properties or any Property Owner.

95.    Upon information and belief, Defendants made these fraudulent representations to Willton despite knowing they were in danger of being (and eventually actually becoming) prohibited from engaging in federal low income housing projects or obtaining Low Income Housing Tax Credits.

96.    Moreover, as detailed in the "Notice of Suspension and Proposed Debarment of Frank T. Sinito" ("Debarment Notice"), a true and accurate copy of which is attached as **Exhibit 5** and incorporated by reference in this Complaint, Defendants' fraudulent actions have already had direct and materially adverse impacts on certain of the FM15 Properties, debarring Millennia Housing Management Ltd. and Sinito from participating in HUD projects or obtaining Low Income Housing Tax Credits.

97.    Further, the Debarment Notice details that as of April 30, 2023, Sinito had underfunded two FM15 Properties' security deposit accounts (Elmcrest Village underfunded in the amount of $40,174.09 and Riverview Terrace underfunded in the amount of $12,444.12).

98.    Similarly, the Debarment Notice evidences Sinito's making of unauthorized loan distributions between January 1, 2022 and April 30, 2023 for the same two FM15 Properties (Elmcrest Village in the amount of $857,787 and Riverview Terrace in the amount of $280,000).

99.    Defendants never disclosed any of the details from the Debarment Notice to Willton or even that Millennia Housing Management Ltd. and Sinito were under investigation.

100.    At the time the parties were negotiating Willton's investment in FM15, Defendants had a duty to disclose all material facts relevant the potential investment and to ensure that all material representations they made to induce Willton's investment were true.

101.    Prior to Willton's investment, Defendants made a series of representations in Sections 2.08 and 2.09 of the Amended Operating Agreement. Included in these representations

was the representation that MH I had the authority to participate in federal housing programs, that

Defendants were unaware of any proceedings that might threaten or jeopardize their ability to

continue doing so, and that there were no existing facts which would likely be expected to have a

material adverse effect (financial or otherwise) on any of the Properties or any Property Owner.

102.    These representations were false, however, and upon information and belief,

Willton anticipates that discovery will demonstrate that Defendants knew these representations

were false, because they knew HUD was investigating and that they were in jeopardy of being

debarred from participating in HUD projects or seeking federal Low Income Housing Tax Credits.

103.    In the alternative to the preceding paragraph, if MH I and Sinito somehow did not

know the HUD investigation was ongoing, the misrepresentation was still made with utter

disregard and recklessness for the truth, because they knew they had been and were still engaged

in a widespread series of potentially criminal actions in their mismanagement of their federal low

income housing projects throughout the country. For example, these actions included:

a.    HUD's accusation of Millennia Housing Management Ltd.'s "financial mismanagement of tenant security deposit accounts and taxpayer funds that provide housing assistance, along with not maintaining property conditions."

b.    According to the Debarment Notice, "[t]he tenant security deposit accounts for fourteen (14) HUD-insured or HUD-subsidized properties were materially underfunded as of April 30, 2023" and "sixteen (16) properties had unauthorized distributions or loans from January 1, 2022, to April 30, 2023. There was a total of 147 improper distributions/loans in the amount of $4,578,671."

c.    According to the Debarment Notice two FM15 properties managed by MH I and the Sinitos had underfunded tenant security deposit accounts (Elmcrest Village underfunded in the amount of $40,174.09 and Riverview Terrace underfunded in the amount of $12,444.12).

d.    According to the Debarment Notice, there were unauthorized distributions of loans between January 1, 2022 and April 30, 2023 for two FM15 properties (Elmcrest Village in the amount of $857,787 and Riverview Terrace in the amount of $280,000).

    e.    Audits of Sinito's management found a plethora of misappropriations of security deposits and operating funds for purposes unrelated to the relevant projects as well as failures to comply with Regulatory Agreements regarding unauthorized distributions.

104.    The Debarment Notice demonstrates that HUD found these events occurred between January 1, 2022 and April 30, 2023, making it appear certain that Defendants were aware of the potential jeopardy they had created prior to closing on the Amended Operating Agreement with Willton.

105.    Defendants' misrepresentations were material to Willton's investment, because Willton would not have invested in the enterprise if MH I and Sinito had not made these representations, including but not limited to the representation by MH I and Sinito that they were able to participate in federal housing programs and seek federal Low Income Housing Tax Credits.

106.    MH I and Sinito intended to mislead Willton and induce Willton's reliance on MH I and Sinito's misrepresentations, including so they could obtain Willton's investment and use it to their own unrelated benefit via unauthorized self-beneficial distributions.

107.    Willton in fact relied on these misrepresentations, and was justified in doing so.

108.    MH I and Sinito's fraud is a direct and proximate cause of damages suffered by Willton in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

109.    Further, Willton is entitled to an award of punitive damages and attorneys' fees due to MH I and Sinito's fraud, as their fraud was intentional and the result of malice.

## COUNT 7
### Fraudulent Transfer against MH I and Sinito

110.    Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-109 of this Complaint.

111.    MH I and Sinito made a series of transfers to Sinito out of the funds of FM15 with an actual intent to hinder, delay, or defraud Willton, a present and/or future creditor.

112.    These transfers to Sinito reflect numerous "badges of fraud" including, but not limited to the fact that:

        a.    MH I and Sinito made the transfers to Sinito, who as MH I's managing member was an insider to the company;

        b.    Under the Amended Operating Agreement, MH I was not permitted to unilaterally make these transfers to Sinito without Willton's consent;

        c.    MH I failed to disclose the transfers or obtain Willton's consent despite having numerous opportunities to disclose and explain the transfers to Willton.

113.    Moreover, MH I and Sinito made the transfers without receiving reasonably equivalent value from Sinito, or any other party, in exchange for the transfers.

114.    Given the facts and circumstances surrounding the transfers, the transfers are fraudulent pursuant to Ohio Revised Code §§ 1336.04 and 1336.05.[1]

115.    In making/accepting the transfers, MH I and Sinito acted with a conscious disregard for the Willton's rights, with a great probability of causing Willton substantial harm.

116.    MH I and Sinito's fraudulent transfers are a direct and proximate cause of damages suffered by Willton in excess of Seventy-Five Thousand Dollars ($75,000.00) with the exact amount to be proven at trial.

117.    Further, Willton is entitled to an award of punitive damages and attorneys' fees as a result of MH I and Sinito's fraudulent transfers, as those fraudulent transfers were intentional and the result of malice.

---

[1] The Amended Operating Agreement is governed by Ohio law. (*See* Amended Operating Agreement § 12.02.)

**COUNT 8**
**Civil RICO Violations (18 U.S.C. § 1962(a)-(d)) against Sinito**

118.    Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-117 of this Complaint.

119.    Sinito and each member of the Sinito Enterprise is a "person" as defined by 18 U.S.C. § 1961(3).

120.    The Sinito Enterprise constitutes an "enterprise" as defined by 18 U.S.C. § 1961(4) because the members of the Sinito Enterprise have associated together for the common purpose of intentionally and willfully defrauding Willton and, on information and belief, other victims.

121.    Sinito has conspired to and has actually conducted a criminal enterprise via the Sinito Enterprise that has engaged in a pattern and practice of racketeering activity in violation of 18 U.S.C. § 1962 that has injured Willton's business and property.

122.    Sinito personally conducts the affairs of the Sinito Enterprise by leading, running, managing, and directing the affairs of the Sinito Enterprise via The Millennia Companies.

123.    Upon information and belief, Sinito personally controls, directs, and receives financial benefit from each of the companies that comprise The Millennia Companies as described in detail above.

124.    In conducting the affairs of the Sinito Enterprise, Sinito has engaged in a pattern and practice of racketeering activity, including but not limited to by defrauding his business partner investors (both Willton and others as alleged herein) and embezzling funds via wire fraud that they have invested in one or more of The Millennia Companies. Sinito has committed these acts of fraud and embezzlement via wire fraud far more than two times within the past ten years.

125.    As detailed throughout this Count and this Complaint, Sinito's pattern and practice of racketeering activity includes having caused MH I to embezzle more than $1.4 million via wire

fraud by making hundreds of unauthorized disbursements from Property Owners' and/or FM15's funds since January 2023. Many of these unauthorized disbursements have been to Sinito himself or to other members of the Sinito Enterprise in which he has a financial interest unrelated to FM15. Each of these hundreds of acts of embezzlement via such unauthorized distributions detailed below constitutes wire fraud in violation of 18 U.S.C. § 1343 and a separate act of racketeering activity as defined by 18 U.S.C. § 1961(1), and they demonstrate a pattern and practice of racketeering activity against Willton specifically.

126.    In violation of 18 U.S.C. § 1962(a)-(d), Sinito – including through hundreds of separate acts of wire fraud in violation of 18 U.S.C. § 1343 that constitute a pattern of racketeering – has derived income and acquired or maintained an interest in the Sinito Enterprise, which engages in interstate commerce. To date, Willton has discovered a total of 108 unauthorized disbursements of funds from FM15's operating account in the aggregate amount of at least $1,463,130 (as of April 30, 2024) to either an entity associated with Sinito's personal bank account, an unrelated entity from a project unrelated to FM15, or to Sinito directly. Of these 108 unauthorized payments, 85 went directly to Sinito personally totaling $1,052,730, and at least 11 other Sinito entities that appear to be members of the Sinito Enterprise also received unauthorized transfers.

127.    Specifically, Sinito, either directly or through the Sinito Enterprise, has transmitted or caused to be transmitted by means of wire communications in interstate commerce, certain writings, signs, signals, pictures, and/or sounds for the purpose of executing a scheme or artifice to defraud Willton by embezzling funds. These incidents of wire fraud included, but were not limited to, the following (all from Property Owners to Sinito or other Sinito-controlled entities):

      a.      On March 9, 2023, $50,000 was wired to Sinito from the Cedar and Warrensville Apartments Limited Partnership;

b.     On April 11, 2023, $15,000 was wired to Sinito from the Parkersburg Powell Limited Partnership;

c.     On May 22, 2023, $10,000 was wired from the Heritage Youngstown Limited Partnership to Hartford Avenue Apartments LLC;

d.     On May 15, 2023, $20,000 was wire from the Liberty Plaza II, Ltd entity to an unrelated property known as Peace Lake LA TC LP;

e.     On May 18, 2023, $10,000 was wired to Sinito from the Cadillac Harbor View LDHA LTD;

f.     On May 22, 2023, $10,000 was wired from the Heritage Youngstown Limited Partnership to an unrelated property, Hartford Avenue Apartments LLC;

g.     On June 6, 2023, $15,000 was wired from the Cedar and Warrensville Apartments Limited Partnership to Sinito;

h.     On June 6, 2023, $20,000 was wired to Sinito from the Heritage Youngstown Limited Partnership;

i.     On June 6, 2023, $15,000 was wired to Sinito from Liberty Plaza II, Ltd;

j.     On June 6, 2023, $30,000 was wired to Sinito from the Flushing Elmcrest Limited Dividend Housing Association Limited Partnership;

k.     On June 29, 2023, $40,400 was withdrawn from the Marquette Snowberry Limited Dividend Housing Association Limited Partnership Account at Independence Bank and deposited in Sinito's personal account via online transfer;

l.     On July 10, 2023, $15,000 was wired from the Petoskey Riverview Limited Dividend Housing Association Limited Partnership account to Sinito;

m.     On September 12, 2023, $20,000 was wired from the Cedar and Warrensville Apartments Limited Partnership to an unrelated property, Cassidy Village, Ohio LLC;

n.     On September 13, 2023, $15,000 was wired from the Cedar and Warrensville Apartments Limited Partnership to an unrelated property, Memphis Towers TN TC LP;

o.     On September 13, 2023, $35,000 was wired from the Cedar and Warrensville Apartments Limited Partnership to an unrelated entity Memphis Towers TN TC LP;

p.     On October 6, 2023, $20,000 was wired from Heritage Youngstown Limited Partnership to an unrelated property, Brookwood NC LLC;

q.     On October 10, 2023, $12,000 was wired from Heritage Youngstown Limited Partnership to an unrelated property, Memphis Towers TN TC LP;

r.     On January 9, 2024, $25,000 was wired from Parkersburg Powell Limited Partnership to an unrelated property, Brookwood NC LLC.

s.     On February 5, 2024, $9,000 was wired from Parkersburg Powell Limited Partnership to an unrelated property, Wilshire Woods Apartments LLC; and

t.     On February 13, 2024, $7,000 was wired from Parkersburg Powell Limited Partnership to an unrelated property, Morningside 2192 TN LLC.

128.    Each of the above transactions constitutes "racketeering activity" relating to wire fraud as defined by 18 U.S.C. § 1961(1), in violation of 18 U.S.C. § 1962(a)-(d) and 18 U.S.C. § 1343.

129.    Upon information and belief, the actions alleged above are also a part of Sinito's pattern and practice of racketeering activity whereby he commits intentional acts to defraud business partner investors like Willton to invest in one or more of The Millennia Companies' operation of low income housing projects and obtaining federal Low Income Housing Tax Credits. Upon information and belief, once Sinito has fraudulently induced such investments, Sinito then routinely engages in acts of embezzlement via wire fraud to the injury of those investors.

130.    Sinito's pattern and practice is further evidenced by other lawsuits filed against him and entities comprising the Sinito Enterprise credibly asserting similar allegations, including one filed on July 11, 2024. (*See Paul Zaretsky v. Millennia Housing Capital, LLC, et al.*, Cuyahoga County (Ohio) Common Please, Case No. CV 24 100446.)

131.    Upon information and belief, Sinito's pattern and practice of racketeering activity as alleged above also includes his use of The Millennia Companies to violate HUD obligations and requirements as part of the Sinito Enterprise's operation of low income housing projects and attempts to obtain federal Low Income Housing Tax Credits, all as a part of a scheme to defraud and then embezzle from investors like Willton via wire fraud.

132.    HUD has accused Sinito and Millennia Housing Management Ltd. of engaging in financial mismanagement of tenants' security deposits as well as taxpayer funds providing housing assistance, along with not maintaining property conditions. Similarly, HUD has accused Sinito and Millennia Housing Management Ltd. of misappropriating millions of dollars from HUD-insured or HUD-subsidized properties throughout the country. Based on these activities, HUD debarred

Sinito and Millennia Housing Management Ltd. from participating in any new HUD business for five years, which is the most severe sanction HUD can impose on a property owner.

133.    Upon information and belief, Willton also expects it will uncover other racketeering activities by Sinito and the Sinito Enterprise during discovery.

134.    Sinito's repeated acts of wire fraud constitute "a pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5). Sinito has committed these patterns and practices of racketeering activity knowingly and intentionally, with the intent to damage Willton's business and property interests.

135.    Sinito's pattern and practice of racketeering activities alleged above, including hundreds of acts of wire fraud, are related, they occurred in and they affected interstate commerce within the meaning of 18 U.S.C. § 1962(c), and they pose a threat of continued criminal activity, both to Willton and to Sinito's other business partners specifically, and to the public generally.

136.    Sinito's acts of wire fraud alleged above have continued for years and will continue into the future if he is not stopped.

137.    Willton has standing to bring this claim against Sinito because there is a direct relationship between its injuries and Sinito's conduct involving a pattern and practice of racketeering activities, as described above. Specifically, at a minimum and as described above, Sinito has committed hundreds of acts of wire fraud in violation of 18 U.S.C. § 1962(a)-(d) and 18 U.S.C. § 1343 and embezzled more than $1.4 million by making these unauthorized disbursements from Property Owners' and/or FM15's funds since January 2023, all to the injury of Willton.

138.    As a direct and proximate result of Sinito and the Sinito Enterprise's actions and pattern and practice of racketeering activities, including wire fraud, Willton has suffered an injury

to its business and property, in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

139.    Pursuant to 18 U.S.C. § 1964, Willton is entitled to its damages from Sinito's violations, specifically including but not limited to treble damages and costs of this lawsuit, including reasonable attorneys' fees.

## COUNT 9
**Breach of Fiduciary Duty (Amended Operating Agreement) against MH I and Sinito**

140.    Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-139 of this Complaint.

141.    While MH I was the Operating Member of FM15, MH I (including through Sinito) owed a fiduciary duty to the members of FM15, including Willton as the majority owner.

142.    MH I had a duty to perform as Operating Member of FM15 in good faith, to refrain from self-dealing, to follow the provisions of the Amended Operating Agreement, and to act in the best interests of FM15 and its members.

143.    As explained in substantial detail above, since the execution of the Amended Operating Agreement, MH I (including through Sinito) consistently acted in bad faith, including but not limited to at least the following:

    a.    Failing to provide Willton with the required books, records, and financial information including tax returns;

    b.    Misappropriating funds;

    c.    Engaging in self-dealing;

    d.    Making unauthorized transfers of money to Sinito and Sinito-owned entities; and

    e.    Violating multiple other provisions of the Amended Operating Agreement as detailed above.

144.    Upon information and belief, Willton believes it will uncover other instances of bad faith and breaches of fiduciary duty once it is able to conduct discovery and/or fully review the books and records of FM15.

145.    MH I's breaches of its fiduciary duties (including through Sinito) are a direct and proximate cause of damages suffered by Willton in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

146.    Further, Willton is entitled to an award of punitive damages and attorneys' fees due to MH I's numerous breaches of its fiduciary duties and intentional conduct, as those breaches were intentional and the result of malice.

## COUNT 10
### Unjust Enrichment against Sinito

147.    Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-146 of this Complaint.

148.    Sinito made or caused to be made a series of transactions transferring assets from Property Owners and/or FM15 to himself and/or entities he controlled.

149.    Willton, as an owner of an 84.86% interest in FM15, is the rightful owner of all or part of the assets that Sinito transferred from FM15 to himself and/or entities he controlled.

150.    Sinito retained the benefit of the unauthorized transfers to himself and/or entities he controlled.

151.    By receiving and retaining the unauthorized transfers to himself and/or entities he controlled without providing adequate compensation in return, Sinito has been unjustly enriched to the detriment of Willton.

152.    As a direct and proximate result of Sinito's unjust enrichment, Willton has been damaged and will continue to be damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

### COUNT 11
### Promissory Estoppel against the Sinitos

153.    Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-152 of this Complaint.

154.    As stated in the Guaranty, "Investor Member [was] unwilling to enter into the Operating Agreement unless Guarantor provides the guaranties under this Agreement."

155.    The Guaranty was executed by the Sinitos.

156.    Within the Guaranty, the Sinitos personally guaranteed the Contractual ROI Payment, which was a clear and unambiguous promise.

157.    Willton reasonably relied on the Sinitos' agreement to pay the Contractual ROI Payment and to provide balance sheets evidencing that they had not less than $41,110,000 in equity.

158.    It was reasonably foreseeable to the Sinitos that Willton was relying on that promise, because the Guaranty stated "Investor Member [was] unwilling to enter into the Operating Agreement unless Guarantor provides the guaranties under this Agreement."

159.    The Sinitos' promises under the Guaranty were false and misleading because they have not honored those obligations.

160.    The Sinitos' promises were made with a conscious disregard for the rights of Willton with the knowledge that substantial harm would result to Willton.

161.    Willton did not and could not know that the Sinitos would not honor their obligations under the Guaranty.

162.    In reliance on the Sinitos' promises as reflected in the Guaranty, Willton invested over $19 million dollars in FM15.

163.    As a direct and proximate result of Willton's reliance on the Sinitos' promises in the Guaranty, Willton has been damaged and will continue to be damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

**COUNT 12**
**Action for Accounting against all Defendants**

164.    Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-163 of this Complaint.

165.    Willton is unable to protect or fully and meaningfully assert its rights because Defendants have been and continue to be in total control of the finances of FM15 and the Property Owners despite MH I being removed as Operating Member of FM15.

166.    The exact amount of Willton's damages that resulted and/or may have resulted from Defendants' self-dealing and breaches of contract, fraud, breaches of fiduciary duties, conversion, fraudulent transfer, and unjust enrichment cannot be determined without an accounting, because the information necessary to determine that amount is within the exclusive knowledge, possession and control of Defendants who have failed to provide Willton with full and accurate books and records for FM15 as required by the Amended Operating Agreement.

167.    Willton is owed fiduciary duties by MH I (including through Sinito) and is entitled to an accounting of the books and records of FM15.

168.    Willton is entitled to profits in Defendants' possession.

169.    Based on all foregoing, Willton's legal and monetary remedies are inadequate without an accounting.

**PRAYER FOR RELIEF**

WHEREFORE, Willton demands judgment against Defendants, jointly and severally, and

prays for relief, as follows:

1.    For payment of the Contractual ROI Payment in an amount to be proven at trial, in excess of $75,000;

2.    For Payment of the Put Right in an amount to be proven at trial, in excess of $75,000;

3.    For total damages in an amount to be proven at trial, in excess of $75,000;

4.    For rescission of the Amended Operating Agreement and a return of Willton's investment in an amount to be proven at trial, in an amount in excess of $75,000;

5.    For any and all relief afforded pursuant to 18 U.S.C. § 1964, specifically including but not limited to treble damages and costs of this lawsuit, including reasonable attorneys' fees;

6.    For an order requiring MH I and the Sinitos to return immediately all funds misappropriated from FM15 and the Property Owners;

7.    For an order requiring a full accounting of the books and records of FM15 and the Property Owners;

8.    For a declaration that pursuant to the Amended Operating Agreement, Defendants are obligated to ensure that MH I does the following:

    a.    Pays Willton the Contractual ROI Payment in the amount of at least $1,288,131.05 as of April 15, 2024 plus interest;

    b.    Pays Willton the amount of the Put Right by purchasing Willton's interest in the relevant properties for $6,327,528.14 as of July 22, 2024 plus interest;

    c.    Makes all distributions to Members in accordance with the Amended Operating Agreement; and

    d.    Operates FM15 and each Property Owner pursuant to Willton's direction until such time as a new manager is named;

9.    For a declaration that pursuant to the Guaranty, the Sinitos are obligated to:

    a.    Contribute the necessary capital to MH I so that MH I can contribute the funds to FM15 and then make the Contractual ROI Payment to Willton in the amount of at least $1,288,131.05 as of April 15, 2024 plus interest; and

    b.  Provide to Willton a true and correct most recent balance sheet evidencing not less than $41,110,000 in equity.

10.    For an expedited hearing pursuant to Rule 57 of the Federal Rules of Civil Procedure, on Willton's declaratory judgment claims;

11.    For reasonable attorney fees (pursuant to the Guaranty), costs, and punitive damages;

12.    For prejudgment and post-judgment interest; and

13.    For such other relief as the Court deems just and proper.

    Respectfully submitted,

    UB GREENSFELDER LLP

_____
David A. Landman
275 Madison Avenue, Suite 2002
New York, NY 10016-1138
Tel: (917) 262-0470

*Attorney for Plaintiff Willton NC NY, LLC*